Baker v. Commonwealth.

---

CASE 22—HOMICIDE—MARCH 16.

# Baker v. Commonwealth.

APPEAL FROM KNOX CIRCUIT COURT.

1. CRIMINAL LAW—EXCLUSION OF WITNESSES.—It is within the sound discretion of the trial court to permit a witness to remain in the court room although the witnesses have been excluded from the court room on the motion of defendant.

2. CRIMINAL LAW—EVIDENCE.—It is probably competent on a trial for homicide to show that the accused had been indicted at the instance of the deceased, as tending to show motive for the killing, but it is error to admit such evidence without instructing the jury that such evidence is competent to show motive only.

3. SAME.—It was error to permit the Commonwealth's Attorney to ask the defendant on cross-examination if he had not been indicted for offenses wholly unconnected with the crime for which he was being tried and not tending to show motive.

4. SAME.—It is not competent to ask a defendant questions whose only possible object is to excite in the minds of the jury a suspicion that he has been guilty of other offenses than the one for which he is being tried.

5. SAME.—It is competent to cross-examine a defendant by asking him with reference to transactions tending to disgrace him, but the period concerning which the inquiry is made should have borne some reasonable relation to the time at which the testimony is given and a period of fifteen years is too remote.

6. SAME—DYING DECLARATIONS.—It is the duty of the trial court before admitting statements as dying declarations to satisfy himself that such declarations were made when the deceased

Baker v. Commonwealth.

was under solemn sense of impending dissolution and in deter-
mining this preliminary question the intendments of law are
in favor of the finding of the trial court, and this court will
give some weight to the finding of the trial judge upon this
question and will defer to his conclusion of fact where the testi-
mony is contradictory.

7. SAME.—It is inadmissible to permit witnesses to state that the
deceased said as a part of his dying declaration "I want all
you people to swear the truth about this."

8. COMMONWEALTH'S ATTORNEY—DUTY OF.—The Commonwealth's At-
torney is a *quasi* judicial officer and should aid the court in
keeping from the jury all testimony which the court has ruled
to be incompetent. He should present the Commonwealth's
case fairly and should not press upon the jury any deductions
from the evidence which are not strictly legitimate. His ob-
ject, like that of the court, should be simply justice.

TINSLEY & FAULKNER FOR THE APPELLANT.    (JOHN G. MAT-
THEWS AND J. SMITH HAYS OF COUNSEL.)

1. There is no exception to the rule as to separation of the witnesses
where it is demanded by either party. One who is a prosecutor
and also a witness should not be present where the other wit-
nesses are testifying, especially when his presence would have
the effect of intimidating witnesses. Salisbury v. Com., 79
Ky., 425; Walker v. Com., 8 Bush, 89.

2. Dying declarations must relate to the death of the deceased and
the circumstances surrounding the death and *in extremis*. 9
Am. & Eng. Ency. of Law, 679: They must be made *in extremis*
under a solemn sense of impending dissolution, when it is con-
sidered that the constant expectation of immediate death will
*silence every motive to falsehood, remove every feeling of re-
venge* and the mind will be induced by the *most powerful con-
siderations to adhere strictly to the truth.* Walston v. Com.,
16 B. M., 15; Vaughan v. Com., 86 Ky., 434; Mathedy v. Com.,
14 Ky. Law Rep., 183; Green v. Com., 13 Ky. Law Rep., 897;
Bates v. Com., 14 Ky. Law Rep., 187; Luker v. Com., 9 Ky. Law
Rep., 385; Adwell v. Com., 17 B. M., 247.

3. A party who did not live over thirty minutes, who had been
drinking, who was constantly saying until he died, "Maybe I
ain't killed; maybe I'll get well; send for a doctor; send for
my gun," and who went down to death cursing and calling on

God to damn his soul, and breathing out threats against his enemy, whose statements are contradictory and untrue, was not in such frame of mind, nor so impressed with the solemnity of death as to give to his statements the sanctity of an oath. "I want all you people to swear the truth," was not such a statement, as related to the *death* or the manner of death of the party making it. Hence, it was error to admit it as a dying declaration. Henderson v. Com., 5 Ky. Law Rep., 244; Leiber v. Com., 9 Bush 13; Collins v. Com., 12 Bush, 272.

4. Proof of other homicides or crimes than the one under trial is not admissible. 9 Am. & Eng. Ency. of Law, 690; Martin v. Com., 93 Ky., 189; Burdett v. Com., 93 Ky., 76; Sayler v. Com., 17 Ky. Law Rep., 100; Eversole v. Com., 16 Ky. Law Rep., 143; Combs v. Com., 14 Ky. Law Rep., 704; Spurlock v. Com., 14 Ky Law Rep., 605.

5. The defendant is subject to the same rule as other witnesses. Sayler v. Com., 17 Ky. Law Rep., 100.

6. He could not be asked if he had killed another man in same difficulty.

7. Evidence that defendant said he had killed other men, or that he had committed other crimes than the one for which he was being tried are inadmissible as calculated to prejudice the jury against him. Eversole v. Com., 16 Ky. Law Rep., 143; Spurlock v. Com., 14 Ky. Law Rep., 605; Combs v. Com., 14 Ky. Law Rep., 704.

8. It was improper and highly prejudicial to permit proof that defendant had been indicted for other offenses and then to permit him to state that he did not commit those other offenses. Roberts v. Com., 94 Ky., 499.

9. It was error to refuse to withdraw the jury on motion of defendant, on account of the improper conduct of attorneys for Commonwealth in exhibiting before the jury two indictments against defendant for house-burning and barn-burning, over the objections of defendant. Cook v. Com., 86 Ky., 664.

10. It was error and highly prejudicial to permit the witness H. B. Howard to say that defendant had hired men to shoot him, at the same time his son was killed, and then refuse to permit defendant to state he did not do any of these things. Roberts v. Com., 94 Ky., 499.

11. Statements of defendant made within five minutes of the homicide and to the first person he met are part of the *res gestae*

Baker v. Commonwealth.

and should be admitted. Shulds v. State, 55 Ga., 696; Harrison v. State, 20 Texas Appeals, 387; Little v. Com., 25 Gratt. (Va.), 921; Galloway v. Com., 5 Ky. Law Rep., 219; Fitzgerald v. Com., 9 Ky. Law Rep., 664.

12. But whether this be true or not, when it was shown by the Commonwealth that a few minutes after the killing Baker came back near where the deceased was, it was competent for him to explain his reasons why he went back there, and to refuse to permit him to so explain was highly prejudicial to him.

W. S. TAYLOR, ATTORNEY-GENERAL, FOR THE APPELLEE.

1. The question of excluding witnesses from the court-room is within the sound discretion of the court; and where the presence of a witness is necessary to enable a party to properly present his case the judge may permit such witness to remain in the court-room. Johnson v. Clem, 82 Ky., 84; Walker v. Com., 8 Bush, 86.

2. The dying declarations were properly admitted. The proof shows clearly that the deceased was conscious of his impending dissolution. State v. Smith, 93 Iowa, 469; Jordon v. State, 82 Ala., 1.

3. It was not an abuse of discretion on the part of the trial court to permit the defendant to be cross-examined with reference to various indictments against him as tending to test his accuracy, veracity or credibility. 7 Am. & Eng. Ency. of Law, 109.

JAMES D. BLACK AND W. R. RAMSEY IN A SUPPLEMENTAL BRIEF FOR THE APPELLEE.

1. The misconduct of John G. White towards one of the attorneys for the appellant, referred to in the argument of this case, does not belong properly to the record and could not avail appellant for a reversal, because even if it were in the record such misconduct did not occur in the presence of the court or the jury.

2. The court properly instructed the jury on the law of the case.

3. The statement of Tom Baker after he had left the scene of the tragedy and had gone 150 or 200 yards away, was not a part of the *res gestae* and was properly refused by the court.

4. Decedent's declarations need not be under the conviction of impending death in order to make them competent. 10 Am. & Eng. Ency. of Law (2d ed.), 368; Idem, 362-3; 1 Greenleaf on Evidence (13th ed.), 156; Same (15th ed.), 226, note E. Pub-

Baker v. Commonwealth.

lic necessity is the true grounds for admitting dying declarations. 1 Greenleaf on Ev., 156, note 2; Lieber v. Com., 9 Bush, 13, 14; Collins v. Com., 12 Bush, 272; Luker v. Com., 5 S. W. R., 354.

5. The condition of declarant's mind as to his approaching death must be determined from all that was said and done and all the circumstances of the case. 10 Am. & Eng. Ency. of Law, *supra;* Polly v. Com., 15 Ky. Law Rep., 502; McHargess v. Com., 15 Ky. Law Rep., 323; Com. v. Matthews, 89 Ky., 292; Young v. Com., 6 Bush, 312.

JUDGE DuRELLE DELIVERED THE OPINION OF THE COURT.

Having been convicted and sent to the penitentiary for life, under an indictment for the murder of W. L. White, Thomas Baker has prosecuted this appeal.

The indictment was found by the grand jury of Clay county, and removed to Knox county for trial, on account of the state of lawlessness existing in the county where found.

The evidence tends to show that appellant and his brother, D. Baker, belonged to a faction which was at feud with another faction to which the deceased, White, belonged. On the day of the killing, they had gone out for the purpose, it is claimed, of seeing G. D. Murray, to whom appellant owed some money; met Murray in the road, and turned back with him in the direction of their home. The Bakers were on foot, and armed with guns and pistols, which is explained by the fact that their father had been shot a short time before by one James Howard, who lived in the neighborhood, and who, as they had been informed, had made threats against their lives. There is also evidence showing that White, the deceased, had repeatedly threatened appellant's life.

Murray, who was on horseback, was some forty yards in advance of the Bakers, when they met deceased. Murray

spoke to White, who was also on horseback, and White said "Good evening," without looking at him, and, as Murray states, with a peculiar expression on his face. At about the time White met the Bakers, Murray states that he looked 'round—which was natural, as he knew the men were enemies—and saw White jerk his horse with his left hand, facing appellant, and draw his arm around, when appellant raised his gun quickly, and fired. At that time Murray's horse threw him, but without injury to him, as he lighted on his feet. He states that neither Tom nor D. Baker went any nearer to White, but came on to where Murray was, and went with him to his father's house. Murray saw no pistol in White's hand, either when they passed in the road or at the time of the shooting, but states that the road was very dusty, and the rays of the evening sun were full in his eyes as he looked back. Murray states that immediately at the shooting White fell from his horse, and Tom Baker loaded his gun before coming on to where Murray was.

The Bakers both state that White drew a pistol from his left side, and was presenting it at appellant, when the latter, with one hand, suddenly raised his gun, and, without taking aim, fired, and White fell to the ground; that neither of them went near him, but that they went on down the road and left him there, and did not see his pistol after they saw it in his hand at the moment of the shooting.

This pistol was found by Reese Murray—the first person to come to White after the shooting—lying in the dust of the road, with the appearance of having been crawled over. Though a double-action pistol, it was cocked when found.

The evidence tends to show that White was a very reckless man when in drink; that he had been drink-

ing that day, and had in his saddle-bags a broken bottle, which had contained whisky; that he was angry with appellant, and had made threats against his life.

A number of witnesses testified as to the declarations concerning the shooting, made by the deceased, who lived only about a half hour after the shooting.

At the trial, upon demand of appellant, the witnesses were put under rule. The commonwealth requested that John G. White, a brother of the deceased—who had been summoned as a witness for appellant—be excepted from the rule; appellant's objection to this being overruled by the court, Baker filed an affidavit stating that John G. White was his most bitter enemy; had taken a very active part in bringing a large number of partisans of the White-Howard faction in Clay county to Barboursville; that attempts had been made to intimidate appellant's witnesses; and that, if White were permitted to remain in the court room, he believed his witnesses would be intimidated. White made affidavit denying any attempt to intimidate any witness, and stating that he had no personal knowledge of the facts attending the killing of his brother, and that he believed the purpose of summoning him as a witness for the defense was to exclude him from the courtroom and prevent him from informing the attorneys for the Commonwealth as to the evidence in the case, with which he had acquainted himself.

By section 601 of the Civil Code it is provided: "If either party require it, the judge may exclude from the court room any witness of the adverse party not at the time under examination, so that he may not hear the testimony of the other witnesses." By section 151 of the Criminal Code it is provided that the provisions of the

Civil Code "shall apply to and govern the summoning
and coercing the attendance of witnesses, and compelling
them to testify in all prosecutions, criminal or penal ac-
tions or proceedings," etc.

Section 601 of the Civil Code has, therefore, been held
to apply to a proceeding to disbar an attorney (Walker
v. Com., 8 Bush, 96), and to trials for felony (Salisbury
v. Com., 79 Ky., 432). But in Johnson v. Clem., 82 Ky.,
87, it was said that: "If this provision (Civ. Code Prac.,
section 601) is to be regarded as mandatory, it would pro-
duce much inconvenience in the practice, and often ob-
struct the proper administration of justice. . . . It
will also often occur in the practice that the presence of
a witness familiar with the history of the case becomes
indispensable by reason of the unavoidable absence of
the litigant, and therefore the necessity of placing that
construction on the statute must conduce to a just and
proper practice by leaving the question as to the exclu-
sion of the witnesses to the exercise of a sound judicial
discretion."

We conclude, therefore, that, even if John G. White
had been summoned as a witness for the defense, in good
faith, the court did not err in permitting him to remain
in the court room during the trial for the purpose of in-
forming the attorneys for the Commonwealth as to the
evidence the witnesses would give.

It is also urged as error that on the cross-examination
of appellant the Commonwealth was permitted, against
objection, to prove by him that he was under indictment
for felony, viz., house burning and burning a store house.
The two indictments were offered in evidence to the jury,
and appellant was asked questions whose object was to
show that the deceased had been instrumental in insti-

tuting the prosecution. He was also asked, against ob-
jection, whether he had been indicted for anything else.
He was also asked what that indictment was for, and the
court excluded the answer to the latter question from the
jury, but allowed the answer that he had been indicted to
remain. The court also permitted him to be interrogated
as to whether he did not go to New York, fifteen or six-
teen years before the trial, for the purpose of getting
counterfeit money.

It was probably competent, as showing a motive for the
killing, to show that he had been indicted at the instance
of deceased.

As said by Judge Lewis in the opinion in Martin v. Com.,
93 Ky., 193, [19 S. W., 580]:

"Motive may be shown in certain cases by a
state of facts conducing to make out another and
distinct offense from that for which the accused
is being tried. . . . Such evidence goes to the
jury as a matter of necessity, for the purpose alone of
showing motive on the part of the accused to commit
the crime, and no more than is necessary to show motive
should be allowed, and then the jury told the purpose
for which the evidence is to be considered by them. Com-
mander v. State, 60 Ala., 1; Pinckord v. State, 13 Tex.,
App., 478."

It does not appear in this record that the jury were in-
formed of the purpose for which alone the testimony as
to the indictments was to be considered, and this appears
to us to be prejudicial error. He was being tried for
two offenses. The fact that a grand jury had indicted
him for burning a dwelling and a storehouse was used
to fix upon him the crime of murder.

As said by Judge Lewis in the Martin case, *supra*: "This

character of evidence is likely to be wrongfully considered by a jury, and made to constitute a part of the offense for which the party is being tried, as it might well be argued that one so depraved as to commit the crime of robbery would not hesitate to commit murder."

We think it was also error to permit appellant to be asked as to other indictments, there being no pretext that this testimony was introduced for the purpose of showing motive. This question appears to have been directly decided in Leslie v. Com., 19 Ky. L. R., 1202, [42 S. W., 1095], where it was held error to ask the defendant if he had not been arrested and tried for carrying concealed weapons, and if he had not been arrested for discharging firearms in a town. As said in that case:

"But in the case at bar the question asked could only be admissible as tending to show appellant's guilt of particular wrongful acts, and therefore within the inhibition of section 597 of the Civil Code, which provides that a witness may not be impeached by evidence of particular wrongful acts, except that it may be shown by the examination of a witness or record of a judgment that he has been convicted of felony."

In Saylor v. Com., 17 Ky. L. R., 103, [30 S. W., 391], it was said by Judge Paynter, delivering the opinion of the court: "Under the bill of rights, he can not be compelled to give evidence against himself; but when he becomes a witness for himself in a criminal prosecution, he waives that right, so far as the charge under investigation is concerned. The fact that he does so waive it does not give the Commonwealth the right to compel him to admit the commission of other offenses, which would subject him to punishment, presentment or infamy."

Nor is it competent to ask a defendant questions whose only possible object is to excite in the minds of the jury a suspicion that he has been guilty of other offenses than the one for which he is being tried.

Nor do we think it was competent to interrogate appellant in regard to a transaction which took place more than fifteen years before, when he was a very young man.

It is true, as indicated in the Saylor case, *supra*, and a number of other cases, that when a defendant in a criminal prosecution voluntarily goes upon the witness stand in his own behalf, he is subject to cross-examination, like any other witness; and in cross-examination directed to the object of shaking his credit by injuring his character he may be compelled to answer questions irrelevant to the facts in issue, though the answers be disgraceful to him. But we do not understand that the entire past lives of witnesses are liable to be ransacked and exposed, and the whole history of their lives laid bare. We are of opinion that the period concerning which the inquiry is made should bear some reasonable relation to the time at which the testimony is given, and that a period of fifteen years is too remote, though we should be reluctant to grant a reversal for such an error alone.

Another objection, very earnestly urged by counsel for appellant, is that the declarations made by deceased just prior to his death, were incompetent, and also that, if competent as to the fact of the killing and the attendant circumstances, portions of the statement were allowed to go to the jury which should have been excluded, and were highly prejudicial.

The evidence tends to show that at the time of making the statements, deceased was in a high state of excitement from anger or drink, or possibly

both. He had been shot in the stomach. The nature of the wound was such as to indicate a fatal result. He was not removed from the roadside, where he lay when the witnesses reached him. The evidence is that he said Tom Baker shot him; shot him for nothing. He told them not to move him; to let him die there; that Baker shot him and never spoke to him. One of the witnesses asked him if he drew his pistol. He said he did not.

The court excluded the statement that Baker shot him for nothing.

Another witness says that he asked White how bad he was hurt, and he said he was killed, and said Tom Baker shot him. The witness asked him if he could do anything for him, and White said if he could get a doctor, maybe he could do something for him. He told witness to tell his wife to come, and told them to bring his gun, and said, "Maybe I am not killed, and, if not, I will be God damned if I——," when one of the women stopped him and told him not to talk that way. White said, "They have my pistol;" and, again, "No; it is in my left hip pocket." Most of these statements appear to have been, from time to time, repeated, during the twenty or thirty minutes that he lived after the shooting. Some of the witnesses were permitted to state, against objection, that White said, "I want all you people to swear the truth about this."

In support of the contention by appellant that all the statements made by White should be excluded as not competent on the ground of being dying declarations, it is urged that the state of mind in which he was, and especially his expressed desire for a doctor, and his reiterated statement that maybe he was not killed, his revengeful feeling as expressed in the threat as to what

he would do in case of recovery, precluded the possibility of the statements made being within the rule as stated in Walston v. Com., 16 B. Mon., 15, that, to be admissible, "these declarations must be made *in extremis*, under a solemn sense of impending dissolution, when it is considered that the constant expectation of immediate death will silence every motive for falsehood, remove every feeling of revenge, and the mind will be induced by the most powerful considerations to adhere strictly to the truth."

There is considerable authority in support of the proposition that calling for a doctor indicates that the statements were not made under a sense of impending dissolution, and that it must appear that they were made when every hope of this world was gone. Wyatt v. Com., 8 Ky. L. R., 55, [1 S. W., 196]; Bates v. Com., 14 Ky. L. R., 177, [19 S. W., 928]; Mathedy v. Com., 14 Ky. L. R., 182, [19 S. W., 977].

And see 1 Greenl. Ev., sections 156-158.

On the other hand, it was held in Green v. Com., 13 Ky. L. R., 897, [18 S. W., 515], that the character of the wound and the attending circumstances may be sufficient to show that the declarant had no hope of recovery.

It may be possible that we should have reached a different conclusion from the trial court as to the admissibility of these statements of the deceased as dying declarations, but it was necessary for the judge of that court to first determine a question of fact, viz., whether, at the time the declarations were made, they were made under a sense of impending dissolution, and when all hope of this world was gone, before he could decide the legal question of their admissibility. The question of fact is bound up in, and is a part of, the question of law. We should therefore give some weight to the finding of the trial judge upon this

question, as he heard the witnesses testify, and was, perhaps, in a better position to estimate the value of their testimony, where contradictory, than this court can be from the bald record of the words they used; and, as the question in the case at bar seems to us to be a close one, we are not inclined to disturb his ruling upon this point.

But it was clearly inadmissible to permit witnesses to state that he said, "I want all you people to swear the truth about this." That statement is admissible for consideration by the court as perhaps tending in some measure to show a consciousness of impending death, in determining the admissibility of statements as to the fact of killing and the attendant circumstances; but it was not competent to go to the jury, and was prejudicial, because it had a tendency to unduly impress them with the weight to be accorded to this exceedingly dangerous kind of testimony.

In Rice on Criminal Evidence, section 330, it is said:

"This species of evidence is obviously liable to great abuse, and should be received with great caution, and only when a proper introduction entitles it to be received. The witness whose testimony is cast upon the record is beyond the reach of cross-examination; all opportunity for investigating the question of malice, enmity, positive identification, is lost forever; and the accused, whose tenure of life is hanging in the balance, has to contend with the additional disadvantage that a just indignation is aroused in the minds of the triors by the mere recital of a hideous crime. Evidence of this character is universally admitted, however, on the ground of necessity; and, in order to prevent the entire frustration of justice, to impart competency to this evidence it must clearly appear that the declarant was conscious of the imminence of death; believed himself to

[15]

be beyond the probabilities of recovery; and this belief must be evident by some word or act of a conclusive and unmistakable character."

All the statements of the declarant were admissible before the court, to enable it to determine whether any of those statements were admissible to the jury as dying declarations. All which did not relate distinctly and pertinently to the facts of the killing and the attendant circumstances, should have been rigidly excluded. And to this end it would have been eminently proper to have excluded the jury while the preliminary examination to determine the admissibility of the statements was had, in which case the witnesses should have been cautioned not to state the inadmissible declarations, and counsel for the Commonwealth should not have asked questions in any way calculated to bring out the incompetent statements.

We do not wish to do injustice to counsel for the Commonwealth, but some of the interrogatories propounded to witnesses, after the statement that Baker shot him for nothing had been excluded, seem to have been— though, perhaps, not so intended—admirably adapted to draw out testimony as to that declaration from subsequent witnesses. Counsel for the Commonwealth should aid the court in keeping from the jury all testimony which the court has ruled to be incompetent, for, though testimony which reaches the jury be excluded by direction of the court, the impression, especially if the statement is often repeated, is likely to remain on the minds of the jury. The duty of a Commonwealth's attorney has been well stated by Chief Justice Paxton of Pennsylvania in Com. v. Nicely, 30 Pa. St., 261, [18 Atl., 737]:

"It is difficult to measure the amount of zeal which is al-

lowable, or, at least, excusable, on the part of counsel engaged in the defense of a man who is upon trial for his life. Writers upon professional ethics differ upon this subject, and I will not discuss it. We have no difficulty, however, in measuring the extent of zeal which counsel for the Commonwealth may properly display upon such occasions. The district attorney is a *quasi* judicial officer. He represents the Commonwealth, and the Commonwealth demands no victims. It seeks justice only—equal and impartial justice—and it is as much the duty of the district attorney to see that no innocent man suffers as it is to see that no guilty man escapes. Hence he should act impartially. He should present the Commonwealth's case fairly, and should not press upon the jury any deductions from the evidence that are not strictly legitimate. When he exceeds this limit, and in hot zeal seeks to influence them by appealing to their prejudices, he is no longer an impartial officer, but becomes a heated partisan. When that officer allows private counsel to assist him in the trial of a cause, such counsel represents him to that extent, and should be governed by the same rules of propriety."

And in Hurd v. People, 25 Mich., 405, it was said by Chief Justice Christiancy: "His object, like that of the court, should be simply justice; and he has no right to sacrifice this to any pride of professional success. And, however strong may be his belief of the prisoner's guilt, he must remember that, though unfair means may happen to result in doing justice to the prisoner in the particular case, yet justice so attained is unjust, and dangerous to the whole community."

See, also, Curtis v. State, 6 Cold., 11, and State v. Sanford, 1 Nott & McC., 512.

For the reasons stated, the judgment is reversed, and

cause remanded, with directions to set aside the judg-ment, and award appellant a new trial, and for further proceedings consistent with this opinion.